Melvin L. HECTOR, Plaintiff,

v.

Jo Anne B. BARNHART, Commissioner of the Social Security Administration, Defendant.

No. CIV.A.H–03–0513.

United States District Court, S.D. Texas, Houston Division.

March 1, 2004.

Victor N. Makris, Attorney at Law, Bellaire, TX, for Melvin Hector, Plaintiff.

Marguerite Esposito Lokey, Special Asst U.S. Attorney, Dallas, TX, for Jo Anne B. Barnhart, Commissioner of the Social Security Administration, Defendant.

### MEMORANDUM AND ORDER

HOYT, District Judge.

On February 10, 2004, Magistrate Judge Calvin Botley issued a Memorandum and Recommendation [Doc.# 14] on Plaintiff Melvin L. Hector's ("Hector") and Defendant Jo Anne B. Barnhart's, Commissioner of the Social Security Administration ("the Commissioner") cross-motions for summary judgment.

This Court has reviewed the Memorandum and Recommendation, noting that no objections have been filed, and the cross-motions for summary judgment filed by the parties. It is, therefore.

ORDERED that the Memorandum and Recommendation is **ADOPTED** as this Court's Memorandum and Order. It is further

ORDERED that Hector's Motion for Summary Judgment [Doc. # 9] is **DENIED**. It is further

ORDERED that the Commissioner's Motion for Summary Judgment [Doc. # 11] is **GRANTED**. It is finally

ORDERED that this matter is **DISMISSED WITH PREJUDICE**.

### MEMORANDUM AND RECOMMENDATION

BOTLEY, United States Magistrate Judge.

Pending before the Court are Plaintiff Melvin L. Hector's ("Hector") and Defendant Jo Anne B. Barnhart's ("the Commissioner") cross-motions for summary judgment. Hector appeals the determination of an Administrative Law Judge ("the ALJ") that he is not entitled to receive Title XVI supplemental security income ("SSI") benefits. *See* 42 U.S.C. § 1382c(a)(3)(A). Having reviewed the pending motions, the submissions of the parties, the pleadings, the administrative record, and the applicable law, this Court recommends that the Commissioner's motion (Docket Entry No.11) be granted, Hector's motion (Docket Entry No. 9) be denied, and that the Commissioner's decision denying Hector benefits be affirmed.

### I. *Background*

On August 25, 2000, Hector filed an application for SSI benefits with the Social Security Administration ("SSA"), claiming that he has been disabled and unable to work since December 1, 1996. (R. 112–115).[1] Hector alleges a variety of disabling conditions, including leg, back and

---

1. References made to the administrative record (*e.g.*, transcripts, exhibits, and other documents) will be denoted by a "R" followed by the applicable page number(s).

neck pain, and arthritis in his hands. (R. 112).

After being denied benefits initially and on reconsideration, Hector requested an administrative hearing before an ALJ to review the decision. (R. 82). A hearing was held on August 7, 2002, in Bellaire, Texas, at which time the ALJ heard testimony from Hector, Stephen M. Goldstein, M.D. ("Dr. Goldstein"), a medical expert who specializes in internal medicine and neurology, Ashok I. Khushalani, M.D. ("Dr. Khushalani"), a medical expert who specializes in psychiatry, and Thomas King ("King"), a vocational expert ("VE"). (R. 23–68). In a decision dated, October 17, 2002, the ALJ denied Hector's application for benefits. (R. 9–18). In her decision, the ALJ found that Hector had the following severe medically determinable impairments: sarcoidosis;[2] degenerative disc disease[3] of the cervical and lumbar spine; affective[4] and anxiety-related mental disorders;[5] and hypertension.[6] (R. 17). The ALJ determined, however, that Hector's impairments did not meet or medically equal one of the listed impairments in Appendix I, Subpart P, Regulation No. 4. (R. 17). The ALJ concluded that, although Hector could not perform his past relevant work as a service station attendant, he could perform light work (*i.e.*, marker, store checker, and sorter), with certain limitations, and that these jobs exist in significant numbers in the national economy. (R. 17–18).

On October 22, 2002, Hector appealed the ALJ's decision to the Appeals Council of the SSA's Office of Hearings and Appeals. (R. 6–8). The Appeals Council, on January 23, 2003, declined to review the ALJ's determination. (R. 4–5). This rendered the ALJ's opinion the final decision of the Commissioner. *See Sims v. Apfel*, 530 U.S. 103, 107, 120 S.Ct. 2080, 147 L.Ed.2d 80 (2000). Hector filed the instant action on February 10, 2003, contesting the Commissioner's denial of his claim for benefits.

## II. Analysis

### A. Statutory Bases for Benefits

SSI benefits are authorized by Title XVI of the Act and are funded by general tax revenues. *See* SOCIAL SECURITY ADMINISTRATION, SOCIAL SECURITY HANDBOOK, § 2100 (14th ed.2001). The SSI Program is a general public assistance measure providing an additional resource to the aged, blind, and disabled to assure that their income does not fall below the poverty line. *See* 20 C.F.R. § 416.110. Eligibility for SSI is based upon proof of indigence and disability. *See* 42 U.S.C. §§ 1382(a), 1382c(a)(3)(A)-(C). A claimant

---

2. "Sarcoidosis" refers to a systematic granulomatous disease of unknown cause, especially involving the lungs with resulting interstitial fibrosis. *See* Stedman's Medical Dictionary 1593 (27th ed.2000).

3. "Degenerative disease" is a disease characterized by the progressive impairment of the function of an organ or organs and not attributable to some cause such as an infection or a metabolic defect. *See* GOULD's MEDICAL DICTIONARY 363 (4th ed.1979).

4. "Affective disorder" or "mood disorder" is a general reference to mental disorders whose essential feature is a disturbance of mood manifested as one or more episodes of mania, hypomania, depression, or some combination. Functional mood disorders are subclassified, *e.g.*, depressive disorders, which includes major depressive disorder and dysthymic disorder. *See* DORLAND's ILLUSTRATED MEDICAL DICTIONARY 528, 530 (29th ed.2000).

5. "Anxiety disorder" refers to a group of mental disorders in which anxiety and avoidance behavior predominate. *See* DORLAND's, *supra*, at 528.

6. "Hypertension" is high arterial blood pressure. *See* DORLAND's, *supra*, at 858.

applying to the SSI program cannot receive payment for any period of disability predating the month in which he applies for benefits, no matter how long he has actually been disabled. *See Brown v. Appfel*, 192 F.3d 492, 495 n. 1 (5th Cir.1999); *see also* 20 C.F.R. § 416.335. The applicable regulation provides:

> When you file an application in the month that you meet all the other requirements for eligibility, the earliest month for which we can pay you benefits is the month following the month you filed the application. If you file an application after the month you first meet all the other requirements for eligibility, we cannot pay you for the month in which your application is filed or any months before that month.

20 C.F.R. § 416.335. Thus, the month following an application, here, August 1998, fixes the earliest date from which benefits can be paid. Eligibility for SSI payments, however, is not dependent on insured status. *See* 42 U.S.C. § 1382(a).

Social Security disability insurance benefits are authorized by Title II of the Act and are funded by Social Security taxes. *See also* SOCIAL SECURITY ADMINISTRATION, SOCIAL SECURITY HANDBOOK, § 2100. The disability insurance program provides income to individuals who are forced into involuntary, premature retirement, provided they are both *insured* and *disabled*, regardless of indigence. A claimant for disability insurance can collect benefits for up to twelve months of disability prior to the filing of an application. *See* 20 C.F.R. §§ 404.131, 404.315; *see also Perkins v. Chater*, 107 F.3d 1290, 1295 (7th Cir.1997).

While these are separate and distinct programs, applicants seeking benefits under either statutory provision must prove "disability" within the meaning of the Act, which defines disability in virtually identical language for both programs. *See* 42 U.S.C. §§ 423(d), 1382c(a)(3), 1382c(a)(3)(G); 20 C.F.R. §§ 404.1505(a), 416.905(a). Under both provisions, disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. *See* 42 U.S.C. §§ 423(d)(1)(A), 1382c(3)(A). Moreover, the law and regulations governing the determination of disability are the same for both disability insurance benefits and SSI. *See Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir.1994), *cert. denied*, 514 U.S. 1120, 115 S.Ct. 1984, 131 L.Ed.2d 871 (1995).

## B. *Standard of Review*

### 1. *Summary Judgment*

The court may grant summary judgment under FED. R. CIV. P. 56(c) when the moving party is entitled to judgment as a matter of law because there is no genuine issue as to any material fact. The burden of proof, however, rests with the movant to show that there is no evidence to support the nonmoving party's case. If a reasonable jury could return a verdict for the nonmoving party, then a motion for summary judgment cannot be granted because there exists a genuine issue of fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

An issue of fact is "material" only if its resolution could affect the outcome of the case. *See Duplantis v. Shell Offshore, Inc.*, 948 F.2d 187, 189 (5th Cir.1991). When deciding whether to grant a motion for summary judgment, the court shall draw all justifiable inferences in favor of the nonmoving party, and deny the motion if there is some evidence to support the nonmoving party's position. *See McAllis-*

*ter v. Resolution Trust Corp.*, 201 F.3d 570, 574 (5th Cir.2000). If there are no issues of material fact, the court shall review any questions of law *de novo. See Merritt–Campbell, Inc. v. RxP Prods., Inc.*, 164 F.3d 957, 961 (5th Cir.1999). Once the movant properly supports the motion, the burden shifts to the nonmoving party, who must present specific and supported material facts, of significant probative value, to preclude summary judgment. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *International Ass'n of Machinists & Aerospace Workers, AFL–CIO v. Compania Mexicana de Aviacion, S.A. de C.V.*, 199 F.3d 796, 798 (5th Cir.2000).

## 2. *Administrative Determination*

■ Judicial review of the Commissioner's denial of disability benefits is limited to whether the final decision is supported by substantial evidence on the record as a whole and whether the proper legal standards were applied to evaluate the evidence. *See Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir.2002). "Substantial evidence" means that the evidence must be enough to allow a reasonable mind to support the Commissioner's decision; it must be more than a mere scintilla and less than a preponderance. *See Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Masterson*, 309 F.3d at 272; *Brown*, 192 F.3d at 496.

■ When applying the substantial evidence standard on review, the court "scrutinize[s] the record to determine whether such evidence is present." *Myers v. Apfel*, 238 F.3d 617, 619 (5th Cir.2001) (citations omitted). If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed. *See Watson v. Barnhart*, 288 F.3d 212, 215 (5th Cir.2002). Alternatively, a finding of no substantial evidence is appropriate if no credible evidentiary choices or medical findings support the decision. *See Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir.2001). The court may not, however, reweigh the evidence, try the issues *de novo,* or substitute its judgment for that of the Commissioner. *See Masterson*, 309 F.3d at 272. In short, "[c]onflicts in the evidence are for the Commissioner and not the courts to resolve." *Masterson*, 309 F.3d at 272.

## C. *ALJ's Determination*

An ALJ must engage in a five-step inquiry to determine whether the claimant is capable of performing "substantial gainful activity," or is, in fact, disabled:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of the medical findings. *See* 20 C.F.R. § 416.920(b).

2. An individual who does not have a "severe impairment" will not be found to be disabled. *See* 20 C.F.R. § 416.920(c).

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors. *See* 20 C.F.R. § 416.920(d).

4. If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made. *See* 20 C.F.R. § 416.920(e).

5. If an individual's impairment precludes performance of his past work, then other factors, including age, education, past work experience, and residual functional capacity must be considered to determine if any work can be performed. *See* 20 C.F.R. § 416.920(f).

*Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir.2000); *accord Boyd*, 239 F.3d at 705. The claimant has the burden to prove dis-

ability under the first four steps. *See Myers*, 238 F.3d at 619. If the claimant successfully carries this burden, the burden shifts to the Commissioner in step five to show that other substantial gainful employment is available in the national economy, which the claimant is capable of performing. *See Masterson*, 309 F.3d at 272; *Greenspan*, 38 F.3d at 236. If the Commissioner is able to verify that other work exists in significant numbers in the national economy that the claimant can perform in spite of his or her existing impairments, the burden shifts back to the claimant to prove that he or she cannot, in fact, perform the alternate work suggested. *See Boyd*, 239 F.3d at 705. A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis. *See id.*

The mere presence of an impairment does not necessarily establish a disability. *See Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir.1992). An individual claiming disability benefits under the Act has the burden to prove that he suffers from a disability as defined by the Act. *See Newton*, 209 F.3d at 452; *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir.1990); *Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir.1988); *Cook v. Heckler*, 750 F.2d 391, 393 (5th Cir.1985). A claimant is deemed disabled under the Act only if he demonstrates an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Shave v. Apfel*, 238 F.3d 592, 594 (5th Cir.2001); *accord Newton*, 209 F.3d at 452; *Crowley v. Apfel*, 197 F.3d 194, 197–98 (5th Cir.1999); *Selders*, 914 F.2d at 618; *see also* 42 U.S.C. § 423(d)(1)(A). "Substantial gainful activity" is defined as work activity involving significant physical or mental abilities for

pay or profit. *See Newton*, 209 F.3d at 452–53; *see also* 20 C.F.R. § 416.972.

"A medically determinable physical or mental impairment" is an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. *See Hames v. Heckler*, 707 F.2d 162, 165 (5th Cir.1983); *see also* 42 U.S.C. § 423(d)(3). "[A]n individual is 'under a disability, only if his impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy ....' " *Greenspan*, 38 F.3d at 236 (quoting 42 U.S.C. § 423(d)(2)(A)). This is true regardless of whether such work exists in the immediate area in which the claimant resides, whether a specific job vacancy exists, or whether the claimant would be hired if he applied. *See Oldham v. Schweiker*, 660 F.2d 1078, 1083 (5th Cir. 1981); *see also* 42 U.S.C. § 423(d)(2)(A).

In the case at bar, when addressing the first four steps, the ALJ determined:

1. The claimant has not engaged in substantial gainful activity during the relevant period under consideration.

2. The claimant's "severe" medically determinable impairments are sarcoidosis, degenerative disc disease of the cervical and lumbar spine, affective and anxiety-related mental disorders, and hypertension.

3. The claimant's medically determinable impairments, singly or in combination, do not meet or medically equal one of the impairments enumerated in the Listing for a finding of disability based on medical factors alone.

4. The claimant's allegations regarding his limitations are not wholly credible

for the reasons set forth in the body of the decision.

5. The claimant has the physical and mental residual functional capacity to perform light exertional activities with the limitation that he work in a climate-controlled environment and with the mental restrictions identified to by Dr. Khushalani.

(R. 17–18). As to the fifth step, the ALJ concluded:

6. The claimant has past relevant medium, unskilled work as a service station attendant (20 C.F.R. § 416.965).

7. The claimant is an individual closely approaching advanced age (20 C.F.R. § 416.963).

8. The claimant has a high school education (20 C.F.R. § 416.964).

9. Considering the claimant's vocational profile and physical and mental residual functional capacity within the framework of Medical–Vocational Rule 202.12, a finding of "not disabled" is warranted as there are a significant number of jobs in the national economy that he can perform. Examples of such jobs include work as a marker, store checker, and sorter.

10. The claimant has not been under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 C.F.R. § 416.920(f)).

(R. 17–18).

This court's inquiry is limited to a determination of whether there is substantial evidence in the record to support the ALJ's findings and whether the proper legal standards have been applied. *See Masterson,* 309 F.3d at 272; *Watson,* 288 F.3d at 215; *Myers,* 238 F.3d at 619; *Newton,* 209 F.3d at 452; *Greenspan,* 38 F.3d at 236; *see also* 42 U.S.C. §§ 405(g), 1383(c)(3). To determine whether the decision to deny Hector's claim for disability benefits is supported by substantial evidence, the court weighs the following four factors: (1) the objective medical facts; (2) the diagnoses and opinions from treating and examining physicians; (3) the plaintiff's subjective evidence of pain and disability, and any corroboration by family and neighbors; and (4) the plaintiff's age, educational background, and work history. *See Martinez v. Chater,* 64 F.3d 172, 174 (5th Cir.1995); *Wren v. Sullivan,* 925 F.2d 123, 126 (5th Cir.1991) (citing *DePaepe v. Richardson,* 464 F.2d 92, 94 (5th Cir. 1972)). Any conflicts in the evidence are to be resolved by the ALJ and not the court. *See Newton,* 209 F.3d at 452; *Brown,* 192 F.3d at 496; *Martinez,* 64 F.3d at 174; *Selders,* 914 F.2d at 617.

## D. *Issues Presented*

Hector contends that the decision of the ALJ is not supported by substantial evidence. Specifically, Hector claims that the ALJ erred by (1) relying upon the opinion of a non-examining medical expert regarding impairment severity, when such opinion was not based upon a review of the entire record; (2) failing to consider all of the treating source evidence in evaluating the severity of his "neurologic condition;" (3) failing to develop the record fully, both as to his cerebellar dysfunction and as to his mental impairments; (4) failing to pose a complete hypothetical question to the vocational expert by not including his neurologic limitations; (5) failing to give the appropriate weight to the opinion of his treating physician; (6) failing to direct him to obtain a more detailed report from the treating physician; (7) failing to complete the analysis set forth in 20 C.F.R. § 404.1527(d)(2) before rejecting the treating physician's views; (8) directing the psychiatric medical expert on the manner by which to formulate his determination of one characteristic of his mental residual functional capacity ("RFC"); (9) relying on the vocation expert's response to a hypo-

thetical based on the flawed mental RFC; and (10) failing to make a determination that he would be able to maintain employment.

The Commissioner disagrees with Hector's contentions, maintaining that the ALJ's decision is supported by substantial evidence.

### E. *Review of the ALJ's Decision*

#### 1. *Objective Medical Evidence and Opinions of Physicians*

When assessing a claim for disability benefits, "[i]n the third step, the medical evidence of the claimant's impairment is compared to a list of impairments presumed severe enough to preclude any gainful work." *Sullivan v. Zebley,* 493 U.S. 521, 525, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990). If the claimant is not actually working and his impairments match or are equivalent to one of the listed impairments, he is presumed to be disabled and qualifies for benefits without further inquiry. *See id.* at 532, 110 S.Ct. 885; *see also* 20 C.F.R. § 416.920(d). When a claimant has multiple impairments, the Act requires the Commissioner to "consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity." 42 U.S.C. § 423(d)(2)(B); *see Zebley,* 493 U.S. at 536 n. 16, 110 S.Ct. 885; *Loza v. Apfel,* 219 F.3d 378, 393 (5th Cir.2000). The relevant regulations similarly provide:

> In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity. If we do find a medically severe combination of impairments, the

combined impact of the impairments will be considered throughout the disability determination process. If we do not find that you have a medically severe combination of impairments, we will determine that you are not disabled.

20 C.F.R. § 416.923; *see also Loza,* 219 F.3d at 393. The ALJ must address the degree of impairment caused by the combination of physical and mental medical problems. *See Gibson v. Heckler,* 779 F.2d 619, 623 (11th Cir.1986) (citations omitted). The medical findings of the combined impairments are compared to the listed impairment most similar to the claimant's most severe impairment. *See Zebley,* 493 U.S. at 531, 110 S.Ct. 885.

The claimant has the burden to prove at step three that his impairment or combination of impairments matches or is equivalent to a listed impairment. *See id.* at 530–31, 110 S.Ct. 885; *Selders,* 914 F.2d at 619. The listings are descriptions of various physical and mental illnesses and abnormalities, most of which are categorized by the body system they affect. *See Zebley,* 493 U.S. at 529–30, 110 S.Ct. 885. Each impairment is defined in terms of several specific medical signs, symptoms, or laboratory test results. *See id.* at 530, 110 S.Ct. 885. For a claimant to demonstrate that his disorder matches an Appendix 1 listing, it must meet *all* of the specified medical criteria. *See id.* (emphasis in original). An impairment that manifests only some of those criteria, no matter how severely, does not qualify. *See id.*

■ For a claimant to qualify for benefits by showing that his unlisted impairment, or combination of impairments, is equivalent to a listed impairment, he must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment. *Id.* at 531, 110 S.Ct. 885 (emphasis in original) (citing 20 C.F.R. § 416.926(a)). A claimant's disability is

equivalent to a listed impairment if the medical findings are at least equal in severity and duration to the listed findings. *See* 20 C.F.R. § 416.926(a). The applicable regulation further provides:

(1)(i) If you have an impairment that is described in the Listing of Impairments in Appendix 1 of Subpart P of this chapter, but—

(A) You do not exhibit one or more of the medical findings specified in the particular listing, or

(B) You exhibit all of the medical findings, but one or more of the findings is not as severe as specified in the listing;

(ii) We will nevertheless find that your impairment is medically equivalent to that listing if you have other medical findings related to your impairment that are at least of equal medical significance.

*Id.* Nonetheless, "[a] claimant cannot qualify for benefits under the 'equivalence' step by showing that the overall functional impact of his unlisted impairment or combination of impairments is as severe as that of a listed impairment." *Zebley*, 493 U.S. at 531, 110 S.Ct. 885. Ultimately, the question of equivalence is an issue reserved for the Commissioner. *See Knepp v. Apfel*, 204 F.3d 78, 85 (3d Cir.2000).

A review of the medical records submitted in connection with Hector's administrative hearing reveals a history of treatment for musculoskeletal complaints and hypertension. In April 1997, Hector complained of headaches and trouble with his right arm. (R. 160). At that time, he reported being unemployed; not taking any medication, except Motrin; smoking one-half pack of cigarettes per day; and drinking five beers per week. (R. 160). Hector also complained of flashbacks to Vietnam and being depressed. (R. 158). He initially was diagnosed with post-traumatic stress disorder ("PTSD")[7] and depression. (R. 158). Although the handwritten notes are difficult to read, it appears that Hector was advised to, among other things, lower his salt intake and to follow-up with a psychological evaluation. (R. 159). In mid-April 1997, Hector was diagnosed with PTSD. (R. 268). He was prescribed an antidepressant medication and a follow-up appointment was scheduled for the following month. (R. 268).

In May 1997, a CT scan of Hector's cervical spine revealed anterior degenerative change, with C7–T1 and minimal C6–C7 disc narrowing.[8] (R. 267). A December 1997 MRI of Hector's cervical spine revealed multilevel degenerative disease, especially at C5–6. (R. 259). Due to Hector's movement during the MRI, images regarding spinal cord compression were only of limited value. (R. 259). A December 1997 CT scan of Hector's brain was taken to rule out a "CVA."[9] (R. 262). The

---

**7.** "Post-traumatic stress disorder" is an anxiety disorder caused by exposure to an intensely traumatic event; characterized by reexperiencing the traumatic event in recurrent intrusive recollections, nightmares, flashbacks, by avoidance of trauma-associated stimuli, by generalized numbing of emotional responsiveness, and by hyperalertness and difficulty in sleeping, remembering, or concentrating. The onset of symptoms may be delayed for months to years after the even. *See* DORLAND'S, *supra*, at 531.

**8.** "C" denotes cervical vertebrae (C1–C7). *See* DORLAND'S, *supra*, at 2006. "Cervical ver-

tebrae" are the upper seven vertebrae, constituting the skeleton of the neck. *See id.* at 1958. "T" denotes thoracic vertebrae (T1–T12). *See id.* at 2015. "Thoracic vertebrae" are the vertebrae, usually twelve in number, situated between the cervical and the lumbar vertebrae, giving attachment to the ribs and forming part of the posterior wall of the thorax. *See id.* at 1958.

**9.** "CVA" is the abbreviation for cardiovascular accident, commonly referred to as a stroke. *See* DORLAND'S, *supra*, at 2007.

CT scan demonstrated minimal cerebral atrophy and moderately severe cerebellar atrophy. (R. 262). The discrepancy was speculated to be due to chronic use of Dilantin, chronic alcoholism, or primary degenerative disease. (R. 262).

In August 1998, an MRI scan of Hector's cervical spine revealed multiple level degenerative disc disease, particularly at C5–6 and C6–7. (R. 151). In September 1998, CT scans were taken of Hector's lumbar and cervical spine. (R. 249–254). The CT scan of his lumbar spine demonstrated fairly severe degenerative disc disease, especially at L4–5.[10] (R. 251–252). The CT scan of his cervical spine showed multilevel degenerative disease. (R. 249). The canal narrowing was present at many levels, but the worst at C5–6, but no spinal compression was observed. (R. 249). Additionally, although the CT scan and myelogram showed multiple nerve root foramen and narrowed and impingement on the thecal sac, no definite nerve root compression could be documented. (R. 249, 253).

In early October 1998, Hector went to a follow-up visit regarding his spine. (R. 147, 246). Hector complained of pain to the touch of his right elbow. A review of the CT scan, however, demonstrated no specific area of stenosis to explain his symptoms. (R. 246). He was referred to an orthopedist for a consultation. (R. 246). Subsequently, in mid-October, progress notes show that Hector was treated by an orthopedic nurse for hand numbness. (R. 244). The nurse speculated that he had cubital tunnel syndrome[11] and suggested that he begin wearing night splints to block flexion. (R. 244).

In late October 1998, Hector revisited his primary care physician, Murthy Mutyala, M.D. ("Dr. Mutyala"), complaining of recurrent neck and hand pain. (R. 243). Dr. Mutyala recommended that he follow-up with both orthopedic hand and spine appointments. (R. 243).

In a follow-up visit in April 1999, Hector advised Dr. Mutyala of his continuing neck and back pain. (R. 242). Dr. Mutyala reported that Hector had not shown up for scheduled follow-up orthopedic hand and orthopedic spine appointments. The appointments were rescheduled and Dr. Mutyala explained the importance of keeping the appointments. (R. 242). Subsequently in April 1999, physical examination revealed subjective weakness and a slight decrease in sensation to light touch in the fingers of Hector's right hand. (R. 239–240). Richard Hanna, M.D. ("Dr. Hanna"), reviewed Hector's medical history and explained that his difficulties related to three different areas, including his cervical spine, cubital tunnel syndrome, and peripheral nerves. Dr. Hanna recommended a neurology consultation. (R. 239).

In June 1999, Hector visited Forbes Barnwell, M.D. ("Dr. Barnwell"), complaining of progressive numbness, tingling, and weakness in the distal right upper extremities. (R. 231, 236). Hector admitted to drinking twelve beers and a bottle of whisky per week for the past four years and off and on since the early 1970's. (R. 237). Dr. Barnwell noted that a cervical CT scan from September 1998 revealed multilevel degenerative joint disease. (R. 231). On physical examination, Hector's gait was

---

**10.** "L" denotes lumbar vertebrae (L1–L5). See DORLAND'S, *supra,* at 2011. "Lumbar vertebrae" are the five vertebrae between the thoracic vertebrae and the sacrum. *See id.* at 1958.

**11.** "Cubital tunnel syndrome" refers to a complex of symptoms resulting from injury or compression of the ulnar nerve at the elbow, with pain and numbness along the ulnar aspect of the hand and forearm, and weakness of the hand. *See* DORLAND'S, *supra,* at 1753.

narrow based with poor tandem, toe and heel walking. (R. 231). Dr. Barnwell's impression was "cervical spondylosis,[12] peripheral neuropathy,[13] and R/O cerebellar degeneration."[14] (R. 231). He scheduled an MRI of Hector's brain. Dr. Barnwell opined that Hector may suffer from alcoholic neuropathy with cerebellar degeneration due to chronic alcohol abuse. (R. 231, 237). In July 1999, progress notes reflected that he continued to have numbness and incoordination. (R. 235).

In August 1999, Hector visited Dr. Mutyala for a follow-up appointment. Dr. Mutyala noted he had no new complaints and was taking Motrin and Methacarbomal. He was well-oriented and showed no signs of distress. (R. 234). During a follow-up visit in August 1999, Dr. Barnwell recorded that Hector continued to complain of numbness and tingling in his lower extremities, which was more pronounced in his right leg. (R. 232). Dr. Barnwell observed that he had cubital tunnel syndrome and was wearing elbow splints with moderate relief. (R. 233). At that time, Hector reported that he had not been taking his pain medication for a month, despite having refills at the pharmacy. (R. 233).

The following month, September 1999, Hector visited the nursing clinic for a blood pressure check. (R. 229). Hector reported that he walked one-half hour per day and did not eat much salt. At the time of the appointment, he reportedly felt fine; however, he was referred to the eye clinic due to having experienced blurred

vision over recent months. (R. 229). A MRI of his brain taken on September 20, 1999, revealed moderate to severe cerebellar atrophy. (R. 226).

In October 1999, Hector was seen at the nursing clinic for a blood pressure check/profile. (R. 224). Hector reported that he walked one-half hour per day. (R. 224). Hector complained of a headache and his blood pressure was slightly elevated, but he admitted to failing to take his blood pressure medication that morning. (R. 224). He was instructed to take his blood pressure medication, continue with exercise, and adhere to his diet. (R. 224). He also had an orthopedic consultation in October 1999, wherein he complained of neck pain. (R. 223). Pain to palpation of C7 was observed and an MRI was scheduled. (R. 223). In November 1999, Hector had another orthopedic consultation. (R. 222). He complained of pain in his right elbow. He admitted not experiencing any elbow trauma and no hypthenar wasting or intrinsic wasting was observed. (R. 222). Because Hector had not tried any conservative treatment, Hector was prescribed a cubital tunnel right elbow (splint) and advised to follow-up in three weeks. (R. 222).

Hector visited Dr. Barnwell for a neurology follow-up appointment in December 1999. (R. 221). Hector reported slight worsening of joint pain. Dr. Barnwell observed on examination that Hector had no pain on palpation of the spinous processes; no diplopia on sustained upward gauze; no

12. "Cervical spondylosis" refers to degenerative joint disease affecting the cervical vertebrae, intervertebral disks, and surrounding ligaments and connective tissue, sometimes with pain or paresthesia radiating down the arms as a result of pressure on the nerve roots. See DORLAND's, supra, at 1684.

13. "Peripheral neuropathy" is polyneuropathy, which is the neuropathy of several peripheral nerves simultaneously. See DORLAND's, supra, at 1432–33.

14. "Cerebellar degeneration" is a familial disease marked by motor disorders and due to cerebellar degeneration, occurring in adults between the ages of thirty and forty and progressing slowly to a fatal termination. See DORLAND's, supra, at 466.

ptosis; no fatigue after several reps of the proximate muscles; and a wide based gait, with a reduced arm swing. (R. 221). A January MRI of Hector's cervical spine revealed a multilevel degenerative disease. (R. 219–220).

In March 2000, Hector visited Dr. Mutyala complaining of chest pain. (R. 218). At that time, he was not taking any medication and did not appear in any acute distress. Dr. Mutyala scheduled Hector for a stress test and a neurosurgical consultation. (R. 218). An April 2000 persantine thallium stress test showed mild to moderate ischemia [15] in the inferoapical, inferior, and inferobasal cardiac segments. (R. 180–184).

Electromyelogram and nerve conduction studies taken in November 2000 were consistent with right C7 radiculopathy.[16] (R. 148). In December 2000, Hector visited the Veterans Administration Medical Center for a preventative medicine (i.e., prostate cancer screen) appointment. (R. 212–214). The progress notes reflect that Hector reported consuming two forty ounce beers on weekends, but refused alcohol counseling. (R. 213). Dr. Mutyala noted that Hector complained of pain in his neck. (R. 215). Dr. Mutyala reported that Hector looked depressed; thus, he referred Hector for a psychological evaluation. (R. 215).

On February 6, 2001, Hector sought treatment for increased depression. (R. 209). Hector advised Arezoo Rahmim, M.D. ("Dr. Rahmim"), that he had no prior psychiatric treatment. (R. 209). Dr. Rahmim noted that Hector had been diag-nosed with PTSD in 1997 and had been referred to the trauma recovery program, but that he failed to follow through with treatment. (R. 209). Hector advised Dr. Rahmim that he drank six sixteen ounce beers occasionally on weekends. (R. 209). Dr. Rahmim diagnosed Hector with PTSD and prescribed anti-depressant medication. (R. 209–210).

Three days later, on February 9, 2001, Donald Gibson II, M.D. ("Dr. Gibson"), performed a consultative examination of Hector, who complained of shortness of breath, chest pain, and intermittent swelling and pain in his hands and legs. (R. 165–166). At the time of the examination, his blood pressure was not taking any respiratory medications and his blood pressure was normal. He also did not take any Nitroglycerin tablets of medication for chest pain. (R. 165). It was further reported that there was no history of peripheral arthritis, joint instability or enlargement, rheumatoid arthritis or spinal disorder. (R. 165–166). With respect to past medical history, Hector claimed to not smoke tobacco and to drink alcohol only occasionally. (R. 166). His only reported surgery was in 1991 for abdominal repair due to a stab wound. (R. 166). Dr. Gibson observed Hector to be a pleasant male in no apparent distress. (R. 166).

On physical examination, Dr. Gibson noted some prolonged expiration with slight expiratory wheezing. (R. 167). A chest x-ray showed diffuse, dense restrictive lung disease [17] with mild obstruction. (R. 167). Dr. Gibson's impression was that

---

**15.** "Ischemia" refers to deficiency of blood in a part, usually due to functional constriction or actual obstruction of a blood vessel. *See* DORLAND's, *supra*, at 920.

**16.** "Radiculopathy" is a disease of the nerve roots. *See* DORLAND's, *supra*, at 1511

**17.** "Restrictive lung disease" is a general term comprising pulmonary diseases charac-terized by decreased total lung capacity, including those caused by disorders affecting the chest wall (*e.g.*, poliomyelitis and scoliosis), and those caused by infiltrative interstitial and infiltrative diseases, such as adult respiratory distress syndrome. *See* DORLAND's, *supra*, at 522.

Hector had interstitial lung disease.[18] (R. 168). Dr. Gibson recommended a lung biopsy and full pulmonary evaluation. (R. 168). Hector's back was observed to be "nontender" and all extremity joints had full range of motion. (R. 167). Dr. Gibson recorded Hector's joint pain as mild, noting there was no severe arthritis, limitation of movement, joint enlargement, or instability. (R. 168). Hector was able to sit, stand, and walk in the normal office setting without assistive devices. (R. 168). Additionally, neurologically, Hector's motor and sensory systems were intact. (R. 167). His gait and coordination were normal. (R. 167). There was no localized sensory loss, muscle weakness, or atrophy. (R. 167). Hector's gross mental-status was normal. (R. 167). With respect to Hector's chest pain, Dr. Gibson reported it as "atypical," and most likely skeletal in origin. (R. 167). There was no evidence of coronary disease. (R. 167). Additionally, Hector's hypertension was stable with no renal, cardiac, or neurological complications. (R. 168).

In March 2001, pulmonary function tests revealed normal FVC and FEV1 values but were not considered accurate because Hector's cooperation and effort during the test were "poor." (R. 170). The following month, April 2001, Hector visited George P. Mixides, M.D. ("Dr. Mixides"), for a pulmonary consultation. (R. 185). Hector claimed to have quit smoking in 1998 and to have worked in construction.

Dr. Mixides diagnosed Hector with miliary tuberculosis.[19] (R. 185). A transbronchial biopsy, however, was more consistent with sarcoidosis. (R. 179).

In March 2001, Hector was referred to Anna Ragavendran Teague, M.D. ("Dr. Teague"), a staff psychiatrist at the Veterans Administration Medical Center, for an initial psychological evaluation. (R. 199–202). He complained of increased depression, feeling angry most of the time, having bad dreams about Vietnam, sleeplessness, and night sweats. (R. 199). Although he claimed to have experienced passive suicidal ideation a few months prior to the evaluation, he admitted that he no longer had those thoughts. (R. 199). He reported no past psychiatric treatment. (R. 200). Dr. Teague diagnosed Hector with PTSD and major depressive disorder ("MDD").[20] (R. 201). She concluded that Hector was not a danger to himself or others and could safely be managed as an outpatient. (R. 201). Dr. Teague prescribed anti-depressant medication and recommended that he return for a medication follow-up visit in six or eight weeks. (R. 201). Additionally, a mental health treatment plan was created to assist Hector with his PTSD. (R. 197–198). This plan included attendance at stress management and PTSD education classes. (R. 197).

Additionally, in April 2001, Hector visited Dr. Teague at the Outpatient Psychia-

---

18. "Interstitial lung disease" refers to a heterogeneous group of noninfectious, non-malignant disorders of the lower respiratory tract, affecting primarily the alveolar wall structures but also often involving the small airways and blood vessels of the lung parenchyma; slowly progressive loss of alveolar-capillary units may lead to respiratory insufficiency and death. See DORLAND's, *supra,* at 518.

19. "Miliary tuberculosis" is a type that varies from a chronic, slowly progressive dehibilitat-

ing infection to an acute fulminating disease; it is caused by hematogenous or lymphohematogenous dissemination of infected caseous material into the bloodstream and seeding of many organs with millet seed-like tubercles. See DORLAND's, *supra,* at 1891.

20. "Major depressive disorder" denotes a mood disorder characterized by the occurrence of one or more major depressive episodes and the absence of any history or manic, mixed, or hypomanic episodes. See DORLAND's, *supra,* at 530.

920

try Clinic for a scheduled visit. (R. 177). Dr. Teague recorded that overall Hector was feeling and sleeping better. (R. 177). Hector claimed, however, that he stayed depressed, to have gotten mad on one occasion, to be worried about his and his wife's health, and to be distrustful of people. (R. 177). On examination, Hector was reportedly satisfactorily groomed and cooperative; his thought process was logical and goal directed; he denied suicidal and homicidal ideation; showed no evidence of delusion of hallucinations; and his concentration, memory, insight, and judgment were intact. (R. 177). Dr. Teague noted that Hector was not a danger to himself or to others and could be managed safely as an outpatient. (R. 178). She recommended a follow-up appointment within eight weeks. (R. 178).

On May 4, 2001, a case assessment form indicates that Hector complained of swelling in his arms, hands, and legs, as well as chest pain. (R. 276). No clubbing, cyanosis, or edema was observed. He had normal peripheral pulses and full range of motion in all joints. (R. 276). His gait was normal. (R. 276). The chest x-ray did not show any evidence of coronary disease; his hypertension was controlled. (R. 276). There was evidence of interstitial lung disease. (R. 276). The reviewing doctor opined that Hector's alleged limitations were not wholly supported by the records. (R. 276). Additionally, on May 22, 2001, after a psychiatric review, Hector was diagnosed with non-severe impairments of affective disorder and anxiety-related disorders (i.e., MDD and PTSD). (R. 272–282). Thereafter, on July 31, 2001, Dr. Teague wrote a letter recommending that Hector receive "appropriate compensation for his service-related disability." (R. 304).

On January 28, 2002, Hector missed a scheduled appointment with Dr. Teague. (R. 295). On May 8, 2002, progress notes of Dr. Teague revealed that Hector was seen briefly because he had a social security form that needed completing. (R. 294). Dr. Teague observed that Hector had been doing better with his current medications. (R. 294). On May 20, 2002, Dr. Teague completed a form entitled Mental Impairment Questionnaire (RFC & Listings) for Hector. She reported that his PTSD results in poor memory, sleep disturbance, mood disturbance, emotional liability, social withdrawal or isolation, decreased energy, recurrent panic attacks, anhedonia or pervasive loss of interests, feelings of guilt/worthlessness, intrusive recollections of a traumatic experience, persistent irrational fears, generalized persistent anxiety, hostility and irritability, nightmares, and chronic anxiety. (R. 305–306). She further reported that Hector's depression had shown improvement with treatment. (R. 306). Hector's anxiety, however, continued to be a problem. (R. 306).

Dr. Teague also opined that Hector's mental impairments result in no useful ability to maintain attention for a two-hour segment; maintain regular attendance and be punctual within customary, usually strict tolerances; work in coordination with or proximity to others without being unduly distracted; make simple work-related decisions; complete a normal workday or workweek without interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors; get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; respond appropriately to changes in a routine work setting; set realistic goals or make plans independently of others; interact appropriately with the general public; travel in unfamiliar places; or use public transportation. (R. 308–309).

"[O]rdinarily the opinions, diagnoses, and medical evidence of a treating physician who is familiar with the claimant's injuries, treatments, and responses should be accorded considerable weight in determining disability." *Greenspan,* 38 F.3d at 237; *accord Myers,* 238 F.3d at 621; *Loza,* 219 F.3d at 395; *Scott v. Heckler,* 770 F.2d 482, 485 (5th Cir.1985). The opinion of a specialist generally is accorded greater weight *than* that of a non-specialist. *See Newton,* 209 F.3d at 455; *Paul v. Shalala,* 29 F.3d 208, 211 (5th Cir.1994), *overruled on other grounds by Sims v. Apfel,* 530 U.S. 103, 108, 120 S.Ct. 2080, 147 L.Ed.2d 80 (2000). Medical opinions are given deference, however, only if those opinions are shown to be more than conclusory and supported by clinical and laboratory findings. *See Scott,* 770 F.2d at 485. Moreover, a treating physician's opinions are far from conclusive and may be assigned little or no weight when good cause is shown. *See Myers,* 238 F.3d at 621; *Loza,* 219 F.3d at 395; *Greenspan,* 38 F.3d at 237. Good cause may permit an ALJ to discount the weight of a treating physician's opinion in favor of other experts when the treating physician's evidence is conclusory, unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence. *See Myers,* 238 F.3d at 621; *Newton,* 209 F.3d at 456 (citing *Brown,* 192 F.3d at 500; *Greenspan,* 38 F.3d at 237; *Paul,* 29 F.3d at 211). It is well settled that even though the opinion and diagnosis of a treating physician should be afforded considerable weight in determining disability, the ALJ has sole responsibility for determining a claimant's disability status. *See Paul,* 29 F.3d at 211; *accord Myers,* 238 F.3d at 621; *Newton,* 209 F.3d at 455.

In the case at bar, based on the objective medical facts and opinions of physicians, there is substantial evidence in the record to support the ALJ's determination that Hector suffered from an impairment which did not meet or equal the requirements of a listing. At the hearing Dr. Goldstein observed that the 1998 electromyelogram and nerve conduction studies that resulted in diagnoses of possible radiculopathy and neuropathy were only minimally abnormal and there was no correlating muscle weakness. (R. 48, 148). Only one physical examination in August 1999 suggested some minimal weakness (R. 48–49, 231); however, in February 2001, Dr. Gibson observed that Hector's motor and sensory were intact; his gait and coordination were normal; and, there was no localized sensory loss, muscle weakness or atrophy noted. (R. 167). Additionally, Dr. Khushalani testified that Hector's depression was being treated with anti-depressant medication and was relatively stable. (R. 53). There was no discernible evidence of decompensations; he had no history of mental hospitalizations; and, at the administrative hearing, Dr. Khushalani observed his demeanor and appearance as not indicative of severe anxiety, despite being in a room with strangers. (R. 53).

Hector contends that the ALJ erred because she and Dr. Goldstein overlooked a September 1999 MRI of Hector's brain, providing that he had moderate to severe cerebellar atrophy. (R. 226). According to Hector, his wide-based gait and reduced arm swing, in April 2001 (R. 221), is characteristic of cerebellar deterioration. Hector's allegation that the ALJ and Dr. Goldstein did not consider the entire record is nothing more than supposition. At the hearing, the ALJ questioned Dr. Goldstein, a neurologist, as follows:

Q: And have you reviewed the evidence of record and heard Mr. Hector testify today?

A: I did.

Q: And is the record as it stands sufficient for you to render a medical opinion on his physical condition from August 29, 2000, forward?

A: Yes.

(R. 46).[21] To the extent Hector was dissatisfied with Dr. Goldstein's review, Hector had the opportunity to cross-examine him regarding the MRI and its likely progression. Moreover, the ALJ noted that her findings were based on the record as a whole. (R. 16). Hector's contentions regarding "overlooked" evidence and the ALJ's purported failure to further develop the record regarding his alleged neurologic dysfunction are without merit.

In sum, Hector's conclusory allegations regarding the importance of the 1999 MRI does not correlate to evidence of reduced RFC. Hence, Hector has failed to establish an impairment or combination of impairments listed in, or medically equal to, one listed in Appendix 1.

### 2. Subjective Complaints

The law requires the ALJ to make affirmative findings regarding a claimant's subjective complaints. See Falco v. Shalala, 27 F.3d 160, 163 (5th Cir. 1994) (citing Scharlow v. Schweiker, 655 F.2d 645, 648–49 (5th Cir.1981)). When a plaintiff alleges disability resulting from pain, he must establish a medically determinable impairment that is capable of producing disabling pain. See Ripley v. Chater, 67 F.3d 552, 556 (5th Cir.1995) (citing 20 C.F.R. § 404.1529). Once a medical impairment is established, the subjective complaints of pain must be considered along with the medical evidence in determining the individual's work capacity. See id. It is well settled that an ALJ's credibility findings on a claimant's subjective complaints are entitled to deference. See Chambliss v. Massanari, 269 F.3d 520, 522 (5th Cir.2001); Scott v. Shalala, 30 F.3d 33, 35 n. 2 (5th Cir.1994); Falco, 27 F.3d at 164; Wren, 925 F.2d at 128. The Fifth Circuit recognizes that "the ALJ is best positioned" to make these determinations because of the opportunity to observe the claimant first-hand. See Falco, 27 F.3d at 164 & n. 18. Moreover, "[t]he Act, regulations and case law mandate that the Secretary require that subjective complaints be corroborated, at least in part, by objective medical findings." Harrell v. Bowen, 862 F.2d 471, 481 (5th Cir.1988) (citing 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 404.1529; Owens v. Heckler, 770 F.2d 1276, 1281–82 (5th Cir.1985)); accord Chambliss, 269 F.3d at 522 (citing Houston v. Sullivan, 895 F.2d 1012, 1016 (5th Cir.1989)); Hampton v. Bowen, 785 F.2d 1308, 1309 (5th Cir.1986).

Here, the medical records and Hector's testimony (R. 32–33) at the administrative hearing set forth his complaints of musculoskeletal pain. As a matter of law, and not surprisingly, the mere fact that working may cause a claimant pain or discomfort does not mandate a finding of disability. See Epps v. Harris, 624 F.2d 1267, 1274 (5th Cir.1980); accord Brown v. Bowen, 794 F.2d 703, 707 (D.C.Cir.1986). "[D]isability requires more than mere inability to work without pain." Gossett v. Bowen, 862 F.2d 802, 807 (10th Cir.1988) (quoting Dumas v. Schweiker, 712 F.2d 1545, 1552 (2d Cir.1983)); accord Brown v. Bowen, 801 F.2d 361, 362–63 (10th Cir.

---

21. To the extent Hector also claims that the ALJ failed to develop the record regarding his mental disorders, this assertion as addressed in detail, infra, is baseless. The administrative record contains ample evidence concerning Hector's mental impairment. The ALJ called Dr. Khushalani, a board certified psychiatrist, to testify as an additional medical expert at the administrative hearing. (R. 51–61). Dr. Khushalani testified that he had reviewed the entire record and it was sufficient for him to render an opinion on Hector's mental limitations. (R. 52).

1986). Under the Act, in order for pain to constitute a disabling condition, it must be constant, unremitting, and wholly unresponsive to therapeutic treatment. *See Hames,* 707 F.2d at 166; *accord Chambliss,* 269 F.3d at 522; *Selders,* 914 F.2d at 618–19; *Harrell,* 862 F.2d at 480. In this case, the record demonstrates that Hector's impairments are treated conservatively with medications; there is no evidence that the medications are not effective. Similarly, there is no evidence that Hector complained of side effects of ineffectiveness. Indeed, Hector testified at the administrative hearing that he could lift 10 to 15 pounds with the right hand and 8 pounds with the left hand without pain. (R. 41). He also testified that he performed some household chores, cooked, shopped, used public transportation, read newspapers, filled out money orders, and attended to his personal business. (R. 35–37). Additionally, he testified that he had worked at the same job at a gas station off and on for years. (R. 32). Moreover, Hector's VA disability benefit application was denied. (R. 32). Taking into consideration all of the above factors, the ALJ correctly concluded that Hector's activities were inconsistent with symptoms and limitations of disabling severity. (R. 16).

In any event, by setting forth his basis for rejecting Hector's reported pain as a source of complete disability, the ALJ heeded the Fifth Circuit's directive that subjective complaints of pain not be ignored. *See Falco,* 27 F.3d at 163; *Carter v. Heckler,* 712 F.2d 137, 142 (5th Cir.1983) (citing *Scharlow,* 655 F.2d at 648–49). Ultimately, the ALJ concluded that Hector's alleged limitations and symptoms were not wholly credible regarding his total disability. (R. 16). Because the record supports the ALJ's conclusion regarding Hector's subjective complaints of pain and the parties do not contest this finding, no error has been shown in this regard.

### 3. *Residual Functional Capacity*

Under the Act, a person is considered disabled:

> ... only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work....

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B). The Commissioner bears the burden of proving that a claimant's functional capacity, age, education, and work experience allow him to perform work in the national economy. *See Bowen v. Yuckert,* 482 U.S. 137, 146 n. 5, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987); *see also Masterson,* 309 F.3d at 272; *Watson,* 288 F.3d at 216; *Myers,* 238 F.3d at 619; *Greenspan,* 38 F.3d at 236. If the Commissioner fulfills this burden by pointing out potential alternative employment, the claimant, in order to prevail, must prove that he cannot perform the alternate work suggested. *See Masterson,* 309 F.3d at 272; *Boyd,* 239 F.3d at 705; *Shave,* 238 F.3d at 594; *Carey v. Apfel,* 230 F.3d 131, 135 (5th Cir.2000).

To determine whether a claimant can return to a former job, the regulations require the ALJ "to evaluate the claimant's "residual functional capacity." " *See Carter,* 712 F.2d at 140; *see also* 20 C.F.R. § 416.961. This term of art merely designates the ability to work despite physical or mental impairments. *See Carter,* 712 F.2d at 140; *see also* 20 C.F.R. § 416.945. RFC combines a medical assessment with the descriptions by physicians, the claimant or others of any limitations on the

claimant's ability to work. *See id.* When a claimant's RFC is not sufficient to permit him to continue his former work, then his age, education, and work experience must be considered in evaluating whether he is capable of performing any other work. *See id.* (citing 20 C.F.R. § 404.1561). The testimony of a vocational expert is valuable in this regard, as "[he] is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed." *Fields v. Bowen,* 805 F.2d 1168, 1170 (5th Cir.1986); *accord Carey,* 230 F.3d at 145; *see also Vaughan v. Shalala,* 58 F.3d 129, 132 (5th Cir.1995).

In evaluating RFC, the Fifth Circuit has looked to SSA rulings ("SSR"). *See Myers,* 238 F.3d at 620. The Social Security Administration's rulings are not binding on this court, but they may be consulted when the statute at issue provides little guidance. *See id.* In *Myers,* the Fifth Circuit relied on SSRs addressing RFC and exertional capacity. *See id.* In that case, the court explained:

First, SSR 96–8p provides that a residual functional capacity (RFC) is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A regular and continuing basis means 8 hours a day, for 5 days a week, or an equivalent work schedule. The RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities. However, without the initial function-by-function assessment of the individual's physical and mental capacities, it may not be possible to determine whether the individual is able to do past relevant work.... RFC involves both exertional and non-exertional factors. Exertional capacity involves seven strength demands: sitting, standing, walking, lifting, carrying, pushing, and pulling. Each function must be considered separately. In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis.... The RFC assessment must include a resolution of any inconsistencies in the evidence.

*Id.* (internal citations omitted); *see* 61 Fed. Reg. 34474–01 (July 2, 1996). The court further commented:

Second, SSR 96–9p also provides that initially, the RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to perform work-related activities.... The impact of an RFC for less than a full range of sedentary work is especially critical for individuals who have not yet attained age 50. Since age, education, and work experience are not usually significant factors in limiting the ability of individuals under age 50 to make an adjustment to other work, the conclusion whether such individuals who are limited to less than the full range of sedentary work are disabled will depend primarily on the nature and extent of their functional limitations or restrictions.

*Id.* (internal citations omitted); *see* 61 Fed. Reg. 34478 (July 2, 1996). The court also noted that SSR 96–9p defines "exertional capacity" as the aforementioned seven strength demands and requires that the individual's capacity to do them on a regular continuing basis be stated. *See id.* To determine that an claimant can do a given type of work, the ALJ must find that the claimant can meet the job's exertional requirements on a sustained basis. *See Carter,* 712 F.2d at 142 (citing *Dubose v. Mathews,* 545 F.2d 975, 977–78 (5th Cir. 1977)).

■ In the case at bar, Hector's physical and mental RFC and exertional requirements were fully analyzed by the ALJ, who found that Hector had severe impairments, including sarcoidosis; degenerative disc disease of the cervical and lumbar spine; affective and anxiety-related mental disorders; and hypertension. (R. 17). The ALJ determined that the medical documentation did not support the severity of limitation alleged by Hector. (R. 16–17).

Dr. Goldstein testified that Hector's physical impairments did not meet or equal the criteria of any impairment in the Listings. (R. 49). According to Dr. Goldstein, the objective medical evidence demonstrated that, despite his impairments, Hector could perform work at the light exertional level, with the limitation that he work in a climate-controlled environment. (R. 50). Likewise, Dr. Khushalani testified that Hector's combination of mental impairments did not impose any restriction on his ability to engage in sustained work activity. (R. 54–55). Based on his review of the record, Dr. Khushalani opined that Hector had limited but satisfactory abilities to follow work rules, interact with co-workers and supervisors, deal with ordinary stress, use judgment, function independently, maintain attention and concentration, understand, remember, and carry out simple job instructions, behave in an emotionally stable manner, react predictably in social situations, and demonstrate reliability; and, he had seriously limited, but not precluded, ability to deal with the public. (R. 55–57). Dr. Khushalani's opinion is consistent with State agency assessments. (R. 277–282). Although Hector claims that the ALJ interjected during cross-examination of Dr. Khushalani, which resulted in the ALJ "directing" Dr. Khushalani on how to make his evaluation of Hector, this assertion is based on nothing more than Hector's own conjecture.

When questioned by the ALJ at the hearing regarding his activities, Hector stated that he was able to lift 10 to 15 pounds with the right hand and 8 pounds with the left hand; that he could walk a block or two; he could walk up one flight of stairs; he could bend at the waist; he performed some household chores; he cooked, shopped, used public transportation, read newspapers, filled out money orders, and attended to his personal business. (R. 35–37, 41–42). Additionally, he testified that he had worked at the same job at a gas station off and on for years. (R. 32).

Taking these factors into consideration, the ALJ determined that "the claimant's alleged limitations and symptoms are not wholly credible insofar as total disability." (R. 16). Based on the record as a whole, including the testimony adduced at the hearing, the ALJ properly made the following assessment:

> "... the claimant retains the following residual functional capacity to perform light exertional activities with the limitation that he work in a climate-controlled environment with the specific mental limitations testified to by Dr. Khushalani."

(R. 16).

It is the ALJ's duty to make credibility determinations based on the medical reports submitted and the testimony given by experts and other witnesses. *See Griego v. Sullivan,* 940 F.2d 942, 945 (5th Cir.1991); *accord Scott,* 770 F.2d at 485 (holding that ALJ is "entitled to determine the credibility of medical experts as well as lay witnesses and to weigh their opinions and testimony accordingly"). The law is clear that, although the opinion of an examining physician is generally entitled to more weight than the opinion of a non-examining physician, the ALJ is free to reject the opinion of any physician when

the evidence supports a contrary conclusion. *See Oldham,* 660 F.2d at 1084; *accord Bradley v. Bowen,* 809 F.2d 1054, 1057 (5th Cir.1987).

▮▮▮ Furthermore, it is within the ALJ's sound discretion whether to solicit the assistance of medical experts at the administrative hearing. *See* 20 C.F.R. §§ 404.1527(f); 416.927(f); *Richardson,* 402 U.S. at 400, 91 S.Ct. 1420. The ALJ may rely on a non-examining physician's assessments where those findings are based upon a careful examination of the medical evidence and do not contradict those of an examining physician. *See Carrier v. Sullivan,* 944 F.2d 243, 246 (5th Cir.1991); *Villa v. Sullivan,* 895 F.2d 1019, 1024 (5th Cir.1990); *Ransom v. Heckler,* 715 F.2d 989, 993–94 (5th Cir.1983). Nonetheless, "[t]he ALJ cannot reject a medical opinion without an explanation." *Loza,* 219 F.3d at 395 (citing *Strickland v. Harris,* 615 F.2d 1103, 1110 (5th Cir.1980); *Goodley v. Harris,* 608 F.2d 234, 236 (5th Cir.1979)). If, however, any of the evidence in the case record, including any medical opinion(s), is inconsistent with other evidence or is internally inconsistent, the ALJ is to weigh all the other evidence in making a determination regarding disability. *See Greenspan,* 38 F.3d at 237 (citing 20 C.F.R. § 404.1527(c)(2)); *see Martinez,* 64 F.3d at 176.

▮▮▮ Here, the ALJ appropriately gave Hector's treating psychiatrist's (Dr. Teague) opinions less weight because the medical record, including her treatment notes, did not support her finding that Hector's mental impairments resulted in the limitations she described. *See Scott,* 770 F.2d at 485. Contrary to Hector's allegation, the ALJ sufficiently explained the basis for giving Dr. Teague's opinion less deference as required by 20 C.F.R. § 416.927(d). (R. 14–15). Indeed, the ALJ observed (R. 15), Hector was first diagnosed with mental impairments in 1997, but failed to follow through on treatment. (R. 158, 209, 268). He again sought treatment in 2001, and was prescribed an anti-depressant medication. (R. 209–210). In addition to the medication, a mental health treatment plan was created to assist Hector with his PTSD, which included stress management and PTSD education classes. (R. 197). There is no evidence in the record, however, that he attended these classes or requested additional treatment. He has never been hospitalized for any mental impairment. (R. 33–34). Additionally, even after 2001, the record provides sporadic progress notes for psychiatric treatment (*e.g.,* February, March, April 2001; May 2002). (R. 177–178, 197–202, 209–210, 295).

Moreover, the ALJ correctly noted that Dr. Teague's opinion was contradicted by other evidence in the record. (R. 15). For example, Dr. Teague opined that Hector had no useful ability to use public transportation (R. 309); however, Hector testified that he used public transportation. (R. 36). Similarly, in progress notes in April 2001 and May 2002, Dr. Teague noted that Hector had improved on his medication. (R. 177, 294). Nevertheless, less than two weeks later on May 20, 2002, when completing the form Hector requested for social security (R. 294), Dr. Teague opined that he had little or no ability to perform most mental end emotional functions at work. (R. 305–311).

▮▮▮ Although Hector argues that Dr. Teague should have been recontacted to seek clarification, there was sufficient evidence in the record for the ALJ to make a determination that he was not disabled and Hector has produced no evidence that such action might have led to a different decision. *See Newton,* 209 F.3d at 458. Thus, there was no requirement for the ALJ to recontact Dr. Teague. As set forth above, the ALJ had good cause to discount the

weight of Dr. Teague's opinion in favor of Dr. Khushalani's assessment of Hector's mental limitations because Dr. Teague's opinions were conclusory and/or otherwise unsupported by the clinical evidence as well as inconsistent with the record as a whole. *See Myers,* 238 F.3d at 621; *Newton,* 209 F.3d at 456 (citing *Brown,* 192 F.3d at 500; *Greenspan,* 38 F.3d at 237; *Paul,* 29 F.3d at 211).

Finally, if not totally disabling, "[p]ain may constitute a non-exertional factor that can limit the range of jobs a claimant can perform." *Scott,* 30 F.3d at 35 (citing *Carter,* 712 F.2d at 142); *see Selders,* 914 F.2d at 618. There must, however, be clinical or laboratory diagnostic techniques which show the existence of a medical impairment that could reasonably be expected to produce the pain alleged. *See id.* (citing *Hollis v. Bowen,* 837 F.2d 1378, 1384–85 (5th Cir.1988)). As noted above, "[p]ain constitutes a disabling condition under the Social Security Act only when it is constant, unremitting, and wholly unresponsive to therapeutic treatment." *Id.* at 618–619 (citations omitted). Here, there is substantial evidence in the record, however, from which the ALJ could conclude that Hector's pain did not limit his ability to perform light work during the relevant time period. *See id.* at 619.

The various tests and clinical notes repeatedly indicated that Hector was not in severe distress. At times, Hector reported using no medication or was controlling the pain with light medication. There was no medical evidence evincing chronic pain of such a nature that would limit Hector's ability to work entirely. In such cases, the ALJ must rely on expert vocational testimony to establish that jobs exist. *See Scott,* 30 F.3d at 34 (quoting *Fraga v. Bowen,* 810 F.2d 1296, 1304 (5th Cir.1987)).

The ALJ asked King, the VE, whether jobs exist in the national economy for an individual of Hector's age, education, past relevant work experience, and RFC, as previously determined. King testified that assuming the hypothetical individual's work restrictions, there were a significant number of light, unskilled jobs a person with Hector's vocational profile and physical and mental RFC could perform, including a marker, a store checker, and a sorter. (R. 64). When asked how many of these jobs exist in the regional and national economy, the VE answered as follows:

> For the store marker, Judge, there would be 2,000 in the regional economy, for the checker, there would be around 3,000, and for the sorter, there would be around 3,500 in the regional economy and for the national economy we would use a multiplier of 35 for each job.

(R. 64–65).

The ALJ also evaluated Hector's age, education, and work experience pursuant to 20 C.F.R. § 416.961. The record reveals that Hector was 53 at the time of the hearing; thus, his vocational profile was that of a person "closely approaching advanced age," with past relevant medium, unskilled work as a service station attendant. (R. 17–18). The ALJ observed that Hector has a high school diploma. (R. 18). After hearing the VE's testimony, the ALJ concluded that Hector (considering his vocational profile and mental and physical RFC within the framework of medical-vocational guideline 202.13) warranted a decision of "not disabled." (R. 17).

Hence, the ALJ properly considered Hector's physical and mental RFC, age, educational background, and work history in arriving at her decision. There is substantial evidence in the record that Hector was capable of performing at least a limited range of light work on a full-time basis and that he could perform work found in significant numbers in the national and local economies. (R. 17–18). Hector has not met his burden to prove that he could

not, in fact, perform the work suggested. *See Carey,* 230 F.3d at 147; *Vaughan,* 58 F.3d at 132; *Selders,* 914 F.2d at 618. Hector has not made an adequate showing that he was unable to perform the jobs identified by the VE.

Hector argues that the ALJ erred because she did not make a separate finding that he could maintain employment. *See Watson,* 288 F.3d at 218. In *Watson,* the ALJ found that the claimant had a severe degenerative disc disease, but was not disabled and had an exertional capacity for medium work. The claimant argued that the ALJ erred in failing to make a determination that he could maintain employment. The Fifth Circuit agreed. This issue, however, was revisited by the Fifth Circuit in *Frank v. Barnhart,* 326 F.3d 618 (5th Cir.2003). In *Frank,* the Fifth Circuit clarified that "nothing in *Watson* suggests that the ALJ must make a specific finding regarding the claimant's ability to maintain employment in every case." *Id.* at 619. The Fifth Circuit further explained:

> ... *Watson* required the ALJ to make a finding as to the claimant's ability to maintain a job for a significant period of time, notwithstanding the exertional, as opposed to non-exertional (*e.g.,* mental illness) nature of the claimant's alleged disability. *Watson* requires a situation in which, by its nature, the claimant's physical ailment waxes and wanes in its manifestation of disabling symptoms. For example, if Frank had alleged that her degenerative disc disease prevented her from maintaining employment because every number of weeks she lost movement in her legs, this would be relevant to the disability determination. At bottom, *Watson* holds that in order to support a finding of disability, the claimant's intermittently recurring symptoms must be of sufficient frequency or severity to prevent the claimant from holding a job for a significant period of time.

An ALJ may explore this factual predicate in connection with the claimant's physical diagnosis as well as in the ability-to-work determination. Usually, the issue of whether the claimant can maintain employment for a significant period of time will be subsumed in the analysis regarding the claimant's ability to obtain employment. Nevertheless, an occasion may arise, as in *Watson,* where the medical impairment, and the symptoms thereof, is of such a nature that separate consideration of whether the claimant is capable of maintaining employment is required. Frank did not establish the factual predicate required by *Watson* to necessitate a separate finding in this regard.

*Id.* at 619–20.

Here, there was no requirement for the ALJ to make a separate finding that Hector could maintain employment because there was evidence that Hector's impairments were the type of intermittent impairments that would prevent him from working on a continuing, regular basis. In fact, the evidence demonstrates that Hector reported to Dr. Teague in a psychological assessment conducted in March 2001 that he had been able to hold a job for ten years. (R. 204). Consequently, the ALJ did not err by failing to make a separate finding regarding his ability to maintain employment for a significant period of time. *See Sanchez v. Barnhart,* 75 Fed. Appx. 268, 270 (5th Cir.2003).

As such, taken as a whole, there is sufficient evidence in the record to support the ALJ's conclusion that Hector was capable of performing at least some light jobs available in the national and local economies, as his exertional and non-exertional limitations did not preclude such work. *See Carey,* 230 F.3d at 147. In short, the bulk of the evidence before the ALJ, when proper legal standards are applied, reflects

that Hector was capable of engaging in substantial gainful activity, precluding a finding of disability within the parameters of the Act. *See Masterson,* 309 F.3d at 273; *Brown,* 192 F.3d at 496–98; *Greenspan,* 38 F.3d at 236; *Falco,* 27 F.3d at 162–64; *Wren,* 925 F.2d at 128; *Selders,* 914 F.2d at 618–20. Accordingly, there is substantial evidence in the record to support the ALJ's finding that Hector was not disabled as that term is defined under the Act.

### III. *Conclusion*

Hence, after reviewing the objective medical facts, the diagnoses and expert opinions of the physicians, the credible subjective evidence, as well as Hector's physical and mental RFC, age, educational background, and work history, the Court finds that the ALJ's determination that Hector is not entitled to disability benefits is supported by substantial evidence, and that the ALJ applied the proper legal standards. There is adequate evidence in the record that Hector was able to perform at least some light work, and that such work existed in substantial numbers in the national economy. Thus, the ALJ's decision denying Hector's disability benefits should stand.

Accordingly, it is **RECOMMENDED** that the Commissioner's Motion for Summary Judgment be **GRANTED**, Hector's Motion for Summary Judgment be **DENIED,** and the Commissioner's decision denying Hector disability income benefits be **AFFIRMED.**

The Clerk shall send copies of the Memorandum and Recommendation to the respective parties. The parties have ten (10) days from receipt to file specific, written objections to the Memorandum and Recommendation. *See* FED. R. CIV. P. 72. Absent plain error, the failure to file objections bars an attack on the factual findings, as well as the legal conclusions, on appeal. The original of any written objec-

tions shall be filed with the United States District Clerk, P.O. Box 61010, Houston, Texas 77208–1010. Copies of the objections must be mailed to the opposing party and to the chambers of the magistrate judge, P.O. Box 610205, Houston, Texas 77208–0070.

February 9, 2004.